UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

CRAIG MOSKOWITZ,            :  No. 3:16-cv-01831(SRU)
           Plaintiff,    :  915 Lafayette Boulevard
                         :  Bridgeport, Connecticut
      vs.                  :
                         :  September 8, 2017
FAIRWAY GROUP HOLDINGS CORP,  :
           Defendant.    :
                         :

- - - - - - - - - - - - - - - x


MOTION HEARING

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

   FOR THE PLAINTIFF:

        LEMBERG LAW, LLC
            43 Danbury Road
            Wilton, Connecticut  06897
        BY:  SERGEI LEMBERG, ESQ.


   FOR THE DEFENDANT:

        McGUIRE WOODS, LLP
            Tower Two-Sixty, 260 Forbes Avenue
            Suite 1800
            Pittsburgh, Pennsylvania  15222
        BY:  JARROD D. SHAW, ESQ.


Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177

1          (Proceedings commenced at 1:52 p.m.)

2          THE COURT:  Good afternoon.  We're here in the

3    matter of Moskowitz v. Fairway Group.  Could I have

4    appearances, please.

5          MR. LEMBERG:  Good afternoon, Judge.  Sergei

6    Lemberg for the plaintiff.

7          THE COURT:  Thank you.

8          MR. SHAW:  Good afternoon, Your Honor.  Jarrod

9    Shaw for defendant Fairway Group Holding Company --

10   Corporation, excuse me.

11         THE COURT:  Shaward?

12         MR. SHAW:  Shaw, S-h-a-w, Your Honor.

13         THE COURT:  Thank you.  Okay, and we're here on

14   the motion to dismiss.  Let me start with a couple of

15   questions, anyway.  Mr. Shaw, is the defendant pressing

16   the *Spokeo* standing issue?

17         MR. SHAW:  If I may, Your Honor, I think yes,

18   but more limited than we articulated in our brief given

19   some of the case law that's come out of at least this

20   district, which we think ultimately will be an issue when

21   we get to summary judgment, but it's a little less clear

22   now given the way it's pled.  But I say in a more limited

23   fashion.  As this case is alleged, there's essentially two

24   classes.  There's this improper consent class where Mr.

25   Lemberg has alleged that there wasn't proper consent to

1    receive the text, and then there's the plaintiff texted

2    the word "STOP" and then received what we would say is one

3    more text after that, inadvertently by the company.  And

4    what we would argue, Your Honor, is that that second

5    component, we would not push the *Spokeo* claim, but

6    anything before that we would argue that the *Spokeo* claim

7    still is in play for those text messages given the

8    plaintiff's consent to receive them, texting to enroll in

9    the program, receiving texts that he was informed about

10   and knew about; and then ultimately when he sent the

11   "STOP" text, we would drop any *Spokeo* arguments for that

12   final text that was received.

13            THE COURT:  Okay, that's helpful.  All right.

14   On the question of consent, I take it that the

15   plaintiff -- maybe either of you can answer this -- I take

16   it the plaintiff was responding to some sort of written

17   promotional material or advertising material?  In other

18   words, how did he know to text "50"?

19            MR. LEMBERG:  Judge, my understanding is that he

20   saw a sign in the store.

21            THE COURT:  Okay.  And what did the sign say?

22            MR. LEMBERG:  Text -- let me be precise.

23            THE COURT:  Text 50 to whatever.

24            MR. LEMBERG:  Text 50, yes.

25            THE COURT:  And then did the sign either contain

1   warnings or contain a link to something that had warnings?

2           MR. LEMBERG:  I have no information to answer

3   yea or nay on that.

4           MR. SHAW:  Excuse me, Your Honor.  That was one

5   of the issues I wanted to address with respect to the

6   pleadings.  When you look at the complaint itself, it's

7   paragraph 18 of the amended complaint, I'll just refer to

8   it as the operative complaint:  Plaintiff messaged "50" to

9   shortcut 70416 in response to Fairway advertisement to

10  receive $50 off a future purchase.  But there's no

11  specificity with respect to what that marketing piece

12  said, and to Your Honor's point, some of the marketing,

13  and without knowing what marketing he looked at, whether

14  it was in store or online, had references to terms and

15  conditions.  I'd further note that the first text that he

16  received had a link to the terms and conditions with

17  respect to this program as well.  So the complaint is just

18  vague on what exactly the marketing material this

19  particular plaintiff reviewed was at the time.

20          THE COURT:  Okay.  That's important to know,

21  isn't it?

22          MR. LEMBERG:  For the defense, I'm sure it's

23  important.  The issue here is not whether he has a claim.

24  The issue is whether the defendant has -- as to those

25  texts -- whether the defendant has the affirmative defense

1  of consent.  The FCC and virtually every court to have

2  addressed it say that consent is an affirmative defense.

3  So the defendant may eventually take the position --

4           THE COURT:  Well, let me just press you on that.

5  Isn't an element of the claim that this was without his

6  prior express consent?  In other words, he has to allege

7  that somebody called his cellular telephone using an

8  automatic telephone dialing system without his prior

9  express consent.  Those are the elements.

10          MR. LEMBERG:  That's the way the statute reads.

11          THE COURT:  So --

12          MR. LEMBERG:  I agree with you.  The courts,

13  however, interpret that language to mean that the defense

14  of consent is an affirmative defense to be raised and

15  proved by the defendant.  Now, in this particular case --

16          THE COURT:  Well, okay.  They may be allowed to

17  prove consent, which would be, frankly, in my view, a

18  general defense; but if somebody wants to label it an

19  affirmative defense, that's fine.  That doesn't eliminate

20  your element, the fact that they can bring as an

21  affirmative defense consent.  You still have to allege and

22  prove, without prior consent.

23          MR. LEMBERG:  True, and we do, and the reason

24  that is is because this is a marketing message.  The law

25  is that for a telemarketing message, a sales call -- now,

1    let me step back a second.

2            THE COURT:  Okay.  The first text came in

3    response to your client texting Fairway.

4            MR. LEMBERG:  True.

5            THE COURT:  Right.  And if he texted Fairway

6    having seen a sign that said "Text 50" and then said "For

7    complete terms and conditions go to this link," why

8    wouldn't that satisfy the statute and have no violation?

9            MR. LEMBERG:  That would not satisfy the statute

10   because the FCC says you can do that, but only for the

11   first text to the consumer.  If you want to send

12   additional texts to the consumer, you must obtain written

13   prior express signed consent.

14           THE COURT:  But my point is this:  When he texts

15   "50," and let's assume for a minute that he saw an

16   advertisement that said "Click here before you text 50

17   because these are the terms and conditions," he sees that,

18   he texts "50," now under the -- what is it, the E-Commerce

19   Act or the E --

20           MR. SHAW:  The E-Sign Act, Your Honor.

21           THE COURT:  E-Sign Act, thank you, the text is a

22   permissible form of his written consent if it reflects his

23   understanding of the terms and conditions.  So I can't

24   tell from the complaint whether he acted with or without,

25   or whether Fairway acted with or without his prior

1  consent.

2           MR. LEMBERG:  I think I understand Your Honor's

3  question because you may be referencing the *Winner v.*

4  *Kohl's* case, which I litigated in the Eastern District of

5  Pennsylvania, which had similar facts.  As we stand at the

6  pleading stage, we don't have the signs that were printed

7  in the stores.  We don't have the disclosures.  We don't

8  have the disclaimers.  The defendant in the Eastern

9  District of Pennsylvania case gave them to us and made

10  them available to the Court.  We don't have them here.

11  Even if we did have and the fact pattern was there, there

12  would need to be a specific determination as to whether

13  the language they have on the sign is compliant with the

14  Act, whether what they're asking the consumer to do is

15  effectively a signature, and whether the consumer is in

16  fact providing his signed written consent under the E-Sign

17  Act, which, by the way, mandates that folks be told that

18  what they're doing is providing their signature, that one

19  of the -- and I know it because I use it in my practice --

20  one of the mandatory requirements of the Act is that you

21  actually tell people, Hey, by the way, you're signing,

22  this is a signature, not just whatever, a text message.

23           So as we stand at the pleading stage, we don't

24  have any of that.  And so we say there is no prior express

25  written consent for him to receive these text messages as

1   the FCC defines prior express written consent.  If it

2   turns out down the road that at summary judgment stage or

3   in discovery that that's not the case or the defendant

4   produces the documents and shows that we had consent as to

5   those claims, that changes; but at the pleading stage the

6   claim survives.

7           THE COURT:  Well, okay, maybe it does; maybe it

8   doesn't.  Well, where are the signs?

9           MR. SHAW:  Pardon, Your Honor?

10          THE COURT:  Where are the signs?

11          MR. SHAW:  We have -- the client has the signs

12  and the disclosures and the like.  If I may just respond

13  to Mr. Lemberg's comments.

14          THE COURT:  But are you going to turn them over?

15  Why haven't you turned them over?

16          MR. SHAW:  I'll gladly turn them over.

17          THE COURT:  Yes, turn them over.

18          MR. SHAW:  I don't think he asked for them.

19          THE COURT:  Well, okay, but I'm asking for them,

20  so turn them over.

21          MR. SHAW:  Absolutely.  The only thing I'd note

22  is to the extent we have different signs, it's incumbent

23  upon the plaintiff to be able to recall, or maybe not, and

24  that will become an issue, what sign he saw and what he

25  thought that sign said, but we will gladly in response to

1    Your Honor turn them over.

2              THE COURT:  Yes, I think you should.

3              MR. SHAW:  Okay.

4              THE COURT:  But you wanted to comment as well.

5              MR. SHAW:  I think you sort of hit the issue.  I

6    was going to say it's a bit backwards because he's

7    pleading to get the discovery, and he has the plaintiff.

8    The plaintiff should be able to articulate what it is he

9    did or did not see.  But to Your Honor's point, we can

10   provide the signs, and then if the next step would be an

11   amendment to address this particular issue or moot this

12   issue in its entirety, we'd be perfectly fine with that

13   approach as well.

14             THE COURT:  Yes, that makes sense to me.  I take

15   it you think that the signs contain the appropriate

16   information to make the text of "50" a signing under the

17   E-Sign Act?

18             MR. SHAW:  Yes, Your Honor, I would take that

19   position, yes.

20             THE COURT:  All right, and I guess those

21   conditions were included in the first text from Fairway as

22   well?

23             MR. SHAW:  Yes, you get that first -- let me

24   just step back if I may for a moment, Your Honor.

25   Mr. Moskowitz is not a neophyte when it comes to the text

1  messaging world or the TCPA collectively.

2          THE COURT:  Right.

3          MR. SHAW:  He's filed several lawsuits with

4  respect to the TCPA and is a lead class representative in

5  those cases.  In addition, he has submitted to the FCC a

6  petition seeking certain rule-making with respect to the

7  TCPA.  I say that not because it doesn't preclude

8  Mr. Moskowitz or prevent him from bringing a claim under

9  the TCPA but illuminates his knowledge about the TCPA.

10  And I say that because you have a circumstance where

11  Mr. Moskowitz texted "50," fully aware and with knowledge

12  of he was going to get responses to that "50" text, which

13  is exactly what happened, and he got:  You're confirmed 4

14  our Mobile VIP Club!  All coupons.

15          So he's being told what he's enrolled himself

16  into, and then he gets -- it comes in two parts, but it's

17  one text:  Thanks for texting us.  We are as excited as

18  you are!  We will send you more details on how to get 50

19  on Monday, 10/17.

20          That's exactly what happened.  He got a text on

21  10/17, Fairway Market:  It's GO time!  Get 50 starts

22  today.  Reply "50" in order to receive your link to sign

23  up.  Reply "STOP" to opt out.

24          He doesn't respond.  The next day he gets a: Get

25  $10 off when you tell us your preferred store.  Here's a

1  link with a specific notification to his cellphone number,

2  and in response to that text message, he sends "STOP."

3  Fairway then, as they're permitted to do under the FCC

4  guidance and the TCPA, sent an opt-out message, and then

5  for reasons we talked about with Mr. Lemberg, he did

6  receive one additional text message after that that said:

7  Let's do this!  Here is your link to register for GET 50.

8          And that's the progression.  So it's not as

9  though -- I think one of the cases I'd liken this to is

10  the *Blow* case out of the Seventh Circuit, where a consumer

11  texted, enrolled in a program, got texts, and that case,

12  Your Honor, is *Blow v. Bijor*a, which is out of the Seventh

13  Circuit, 855 F.3d 793, and that case talks about pretty

14  much a similar situation where a consumer texted their

15  enrollment in a program, they got texts, and then they

16  claimed that they had never provided consent, and the

17  Court in that case said, Well, you did.  You texted

18  yourself into the program to participate in receiving

19  texts.  And we would argue, Your Honor, that that is what

20  happened here.

21          THE COURT:  Right.  That was a summary judgment

22  decision.

23          MR. SHAW:  It was, Your Honor, but given

24  Mr. Moskowitz's admission that he texted into the program,

25  we think the face of the complaint would allow you to make

1  that ruling at the motion to dismiss stage.

2          THE COURT:  Okay.  You mentioned Mr. Moskowitz's

3  history as a litigant.  Are you making or pressing a

4  prudential standing issue?

5          MR. SHAW:  Yes, Your Honor, and that was where I

6  was trying to draw the dividing line between after he sent

7  the "STOP" text and then did get the one more.  I think I

8  would withdraw the *Spokeo* argument on that point, but the

9  prudential standing argument for everything before that,

10  given his experience, given his zone of interest, given

11  his expectations and experience that he knew he was going

12  to get these text messages, to argue that he has standing

13  for those messages to represent a class of individuals we

14  think is precluded under the law.

15          THE COURT:  Okay.

16          MR. LEMBERG:  If you look on PACER, Judge, I've

17  represented Mr. Moskowitz for years.

18          THE COURT:  Right.

19          MR. LEMBERG:  The vast majority of those cases

20  were cases that were filed based on the ATM notice,

21  regulations that require the disclosure of a fee, and the

22  man travels so he takes money out of these.  That law

23  changed, so there was a bunch of lawsuits that got filed.

24  We won a decision, I don't recall whether it was you or

25  Judge Shea who ruled that he still had a claim on the old

1   law even though the law changed, and he could pursue his

2   claim.  But we made a decision at that point to settle

3   those lawsuits individually because, in my judgment, the

4   damages for the class, even if there was a class based on

5   some diminimus amount, it just wasn't an appropriate way

6   to spend time in the legal system, and so the vast

7   majority of those cases got resolved.  The remainder, I've

8   represented him occasionally here and there.  I don't

9   think in my view, and I'm an active consumer lawyer, I'm

10  told I file the second or third most TCPA lawsuits in the

11  country, I didn't know that before today, but he's just a

12  guy who knows what the law is.  That doesn't make him a

13  good or bad person, doesn't foreclose him from bringing

14  lawsuits or going into court, especially once a year,

15  which appears to be what he is doing, maybe slightly more

16  frequently than that.  So that's on that.  I don't think

17  there's a standing issue here.  Certainly if you look back

18  20 or 30 years to the age of these folks in the securities

19  cases who were filing securities class actions left and

20  right, he is a little flea compared to those people.  They

21  would file, you know, 40, 50, 60, 70 cases and proceed

22  with all of them on a class action basis.  So I don't

23  think there's a prudential standing here or standing as to

24  that.  He's knowledgeable about what the law is.  That

25  doesn't mean that the doors of the courthouse ought to be

1    closed to him.

2    THE COURT:  Well, right, but I mean it may come

3    up in the class certification stage.  I mean, if there's

4    evidence that he was seeking to create a claim, then he

5    may not be the best class representative.

6    MR. LEMBERG:  If there's evidence, Judge, that

7    he's seeking to create a claim, then this lawyer won't be

8    representing him in that case.  This is not --

9    THE COURT:  Well, you know, I don't want to get

10   ahead of myself, but it seems a little odd to sign up and

11   get, in essence, two texts, one of which just says "thanks

12   for signing up," and then when you get the next one to

13   suddenly change your mind and decide that there's a class

14   action here that ought to be brought.  I mean the

15   aggravation, if any, seems miniscule.  I don't know.

16   Let's not get ahead of ourselves.  We've got some issues

17   here.

18   What about the -- I don't know if either of you

19   want to say anything more about standing or consent.

20   Those were the first two issues I had.

21   MR. SHAW:  No, Your Honor.  Just to be clear,

22   when I said the three or four cases a TCPA plaintiff, I

23   wasn't referring to the additional cases that he'd filed

24   in any capacity.  So I just didn't want to make it as

25   though I was trying to obscure the record.

1          THE COURT:  That's fine.  What about the ATDS?

2  What inference can reasonably be drawn from the complaint

3  that the defendant used an ATDS?

4          MR. LEMBERG:  Judge, may I assume that's for me?

5          THE COURT:  Yes.

6          MR. LEMBERG:  The inferences are that the

7  messages appeared to be template-based, that they do not

8  appear to be personalized in any way, that we plead that

9  it's an automated program that sent a number of messages,

10  including a message to him after he asked for the program

11  to stop sending messages.  And --

12          THE COURT:  Right, but what was the time delay

13  there?  If you call up and leave a message for my wife and

14  say, "Tell your husband not to come to the meeting

15  tomorrow," it's going to take a while, or, "Don't call me

16  tonight" -- let's do it that way -- "Don't call me

17  tonight," and I get home and say, "Oh, I forgot to call

18  Attorney Lemberg," and I quickly call you because she

19  hasn't had time to tell me that you said, "Don't call me,"

20  and then I call you, I mean, in other words, you're

21  assuming that there's a machine involved because of what

22  I'll call a miscommunication.  I think the inference, the

23  rational inference, is almost to the contrary.  If it's a

24  machine and it gets "STOP," why would it send anything

25  other than the confirmation of the stop?  If it's a person

1  who's running the 50 program and that person hasn't yet

2  learned that a stop text came in, that person can send out

3  what they said they were going to send out the other day,

4  which is more information about the 50 program.

5          MR. LEMBERG:  I can answer that question.

6          THE COURT:  Okay.

7          MR. LEMBERG:  I can answer the why question.

8  The answer to that is the machine is not working right.

9  The machine, at least in my experience --

10         THE COURT:  Well, that's a possibility, but why

11 is that more plausible than my scenario?

12         MR. LEMBERG:  Because -- well, there's a case

13 called *Rita's v. Italian Ice*s in the Eastern District of

14 Pennsylvania, which resolved through a class action

15 settlement about a year ago, and it was very similar.

16 They were sending text messages, the folks were saying

17 "STOP," and the machine continued sending the text

18 messages.  I can tell you what happened there.  The

19 machine was --

20         THE COURT:  Okay.

21         MR. LEMBERG:  -- malfunctioning --

22         THE COURT:  Okay.

23         MR. LEMBERG:  -- and not treating the stops as

24 stops.

25         THE COURT:  And our machine didn't do that.  Our

1  machine treated the stops as a stop because there's an

2  immediate -- assuming it's a machine -- there's an

3  immediate response that, in effect, you've unsubscribed.

4  That is the first response to the stop.  So the machine,

5  if it's a machine, knows that the stops come through.  So

6  you have to have a really strange malfunction in the

7  machine that the "STOP" text is acknowledged, and yet a

8  second text comes through.

9          MR. LEMBERG:  That's what they're programmed to

10  do, and I think the only -- the only --

11          THE COURT:  Well, when you say that's what

12  they're programmed to do, what's the evidence of that?

13  What's the allegation of that because we don't have an

14  allegation in the complaint about any of this that we're

15  talking about now.

16          MR. LEMBERG:  The allegation is that he texted

17  "STOP," that the machine acknowledged the text and sent

18  him an additional message.  So the --

19          THE COURT:  But you don't have any basis to make

20  that allegation.

21          MR. LEMBERG:  I do.  I know how these things

22  work.

23          THE COURT:  Well, yeah, I'm always skeptical of

24  all-knowing lawyers who are going to become witnesses at

25  trial and let me tell you how it worked.  You need to

1  allege in the complaint a plausible inference that this

2  was a machine as opposed to a person.

3          MR. LEMBERG:  One way we have done -- well, I'm

4  not sure what else, Judge.  You know, I go back to all the

5  cases, most of which are cited in the brief.  I'm not sure

6  what a plaintiff at the pleading stage can plead that is

7  more than we have pled.

8          THE COURT:  Well, okay, but --

9          MR. LEMBERG:  I know what I would -- I know that

10 based on my experience that they have code, it's usually

11 written in PHP, there's usually a template that's

12 preloaded, a PHP template that's preloaded to send out

13 messages.  Sometimes it has graphics; sometimes it

14 doesn't.  The PHP template gets parameters that are loaded

15 into a database that get --

16          THE COURT:  I don't want to interrupt you, but

17 it's like some lawyer saying, "Cops always beat up people

18 they arrest.  I know this because I've seen cops beat up

19 people all the time."  It's not what often happens; it's

20 what facts do you have that give rise to an inference that

21 it happened in this case?  You can't tag this defendant

22 with what a lot of other corporations might do, and this

23 is not a case, for example, where the first text was a

24 junk text.  This was your client responding to something,

25 we don't yet quite know what, and a response coming to his

1   text.  So it's a different -- look, if you got a junk text

2   out of the blue, you have no relationship with this

3   entity, and you get a text, you know, buy your Christmas

4   tree at whatever garden place, you know, gimme a break, I

5   mean that's probably coming from a machine that went out

6   to thousands of people, right?  But here the first text

7   from the company is in response to your client's text.

8           MR. LEMBERG:  Judge, I know what you're asking,

9   and I know what's possible and not possible.  The question

10  is how do you know it's a machine?  I only know what I can

11  see, the pattern of text messages.  I know, for instance,

12  that they've pulled a log of these messages from the

13  machine that sent them, it's right in their papers, and I

14  know the pattern of how it happened.  From that, from

15  that, there's two things you can do.  You can say, Well,

16  we can infer that it's a machine doing it, and it's

17  plausible that it's a machine doing it, and it's also

18  plausible that it's a human being that's doing it, okay?

19  Both things are plausible.  You don't need to decide now

20  which one is right and which one is wrong.  All you have

21  to decide is whether it's plausible, it's possible that

22  it's a machine doing it.

23          THE COURT:  Not possible; plausible.  There is a

24  difference.

25          MR. LEMBERG:  And the answer -- the real answer

1  is, well, gees, we get into discovery, and we find out

2  what kind of machine was doing it and what it was doing.

3  I've been -- right now there's a lawyer in my office

4  taking a deposition in one of these cases, and it turned

5  out that these things were sent by a human, and it may

6  turn out here that the same is true, although I doubt it.

7  I think that the only thing you can draw from the pleading

8  itself is that a machine is sending the messages, like it

9  always does.

10         THE COURT:  But all you're saying is, We pled

11  the element of the statute, and I know -- "I" being you

12  know -- machines always do it, and yet you just told me

13  about a case where a machine didn't do it.  So it's not

14  enough for a lawyer to come in and say, Well, Judge,

15  machines always do it; therefore, let us survive the

16  motion to dismiss.  The pleadings are governed by rules,

17  and the rules are you have to plead enough facts that give

18  rise to an inference, facts as opposed to the element says

19  it was a machine, so we allege it was a machine.

20         MR. LEMBERG:  And that's what we've done in the

21  complaint, Judge.

22         THE COURT:  Where are the facts?

23         MR. LEMBERG:  We've gotten away -- there were

24  cases out there saying all the plaintiff is doing is

25  reciting the elements of the TCPA.  Okay, so we got away

1  from that.  We allege facts.  Second amended complaint,

2  which must be taken as true --

3          THE COURT:  Paragraph 26:  The text messages

4  sent to plaintiff's cellular phone by defendant were made

5  with an ATDS as defined by the statute and the FCC.

6          MR. LEMBERG:  Right, but --

7          THE COURT:  That's conclusory.

8          MR. LEMBERG:  -- paragraph 6.

9          THE COURT:  That's conclusory.

10          MR. LEMBERG:  That is conclusory, I agree with

11  you, but the facts in the complaint are not conclusory.

12  Paragraph 6:  Fairway established an automated messaging

13  program.  Paragraph 26, second sentence:  The defendant's

14  system placed the texts automatically using a list or

15  database of telephone numbers and dialing without human

16  intervention.

17          THE COURT:  Right.

18          MR. LEMBERG:  Paragraph 27 --

19          THE COURT:  But all you're doing is setting out

20  as facts the elements of the claim.

21          MR. LEMBERG:  We're pleading the facts which

22  underlie the elements.  Nothing else we can do.

23          THE COURT:  Well, you can have a fact -- you

24  could have written this six months before your client got

25  the text because this is simply what you're required to

1  plead under the statute.  It's not anything about what

2  actually happened to him.

3       MR. LEMBERG:  We have gone so far in other cases

4  as to write the actual code the defendants used to

5  transmit messages of this kind using the system that they

6  have.  I think doing that would be way more than a

7  plaintiff at the pleading stage ought to be required, and

8  the cases recognize it.

9       THE COURT:  Okay.  All I'm saying is you haven't

10  given me any facts about your client in this case that

11  give rise to any inference that a machine was involved.

12  You haven't told me why the texts, for example, that he

13  actually received were something sent by a machine rather

14  than something sent by a person.  It's completely devoid

15  of any fact that would give rise to an inference.  All

16  you've done is --

17       MR. LEMBERG:  If you're not inferring from the

18  facts which are in the complaint that -- if the inference

19  you're drawing is that it's implausible from what's in the

20  complaint that a machine sent them, then maybe that's

21  true.  You know, I'm bound by mediation privilege, so I'm

22  not, without my brother's consent, going to insert into a

23  pleading what I know, but a plaintiff -- and there's

24  decision after decision saying, look, what does a

25  plaintiff know at the pleading stage?  And at the pleading

1  stage --

2          THE COURT:  There's also case after case that

3  says discovery is to support a claim, not to find one.

4  What you're basically saying is, My client got a text

5  after he texted "STOP."  We get discovery to figure out if

6  a machine did it or not.  We get discovery to figure out

7  whether he consented to it or not.

8          The only thing you know is it was his cellphone.

9  You don't have any other element except he got a text on

10  his cellphone.  That's the fact that you have; and from

11  that fact you're simply willing to plead, supposedly as

12  facts, information that you have no basis for supporting.

13  You're just assuming and/or alleging without any apparent

14  basis that these other things are true.

15          MR. LEMBERG:  And what you're saying, Judge, is

16  that a consumer who receives a text message after he asks

17  the system with which he is communicating to stop doesn't

18  get to sue under the federal statute that prohibits this

19  sort of thing unless he, at the pleading stage, gets to

20  figure out what system the defendant is using, how it is

21  being used and how it transmits the messages to him, or --

22  there's no way to do it at the pleading stage.  There is

23  nothing --

24          THE COURT:  Sure there is.  You find five other

25  people, ten other people with the same experience who all

1    got the identical message.

2              MR. LEMBERG:  I can't solicit.

3              THE COURT:  I'm not saying solicit.

4              MR. LEMBERG:  How am I going to do it?

5    Soliciting --

6              THE COURT:  No, no.  You stand outside the

7    Fairway store and --

8              MR. LEMBERG:  Can't do it.  Mark Dubois would

9    tell me I'm going to get disbarred.

10             THE COURT:  Not to find a client; to

11   investigate.  You're allowed to investigate a claim.

12   There's no ethical problem with investigating a claim.

13   Excuse me, I'm just doing some surveys here.  Do you have

14   the ad?  Are you getting text messages from so and so?

15             MR. LEMBERG:  I'd be afraid to lose my license

16   for doing that.

17             THE COURT:  Why?

18             MR. LEMBERG:  Because I'm approaching third

19   parties --

20             THE COURT:  Hire an investigator.  Hire an

21   investigator.  Have you never hired an investigator?

22             MR. LEMBERG:  Not for this kind of thing.  I'd

23   be scared.

24             THE COURT:  Why?

25             MR. LEMBERG:  I'd be terrified.

1          THE COURT:  You're asking potential witnesses

2     for information.  Why are you terrified?

3          MR. LEMBERG:  Well, maybe here's a way to do it

4     where I wouldn't be terrified.  Maybe what we can do is

5     maybe we can do some discovery prior to interposing an

6     amended complaint to discern whether the defendant is

7     using a computerized system or is sending these messages

8     in a -- whether a human is responding and then

9     deliberately breaking the law by continuing to text post

10    stop.  That is something that I've done before.  I've

11    never sent investigators to do surveys.  I've asked how

12    this could be done, and the answer is always no.

13         THE COURT:  I think the answer is you have an

14    ethical obligation to investigate, and you have an

15    obligation under Rule 11 not to plead as a fact something

16    that you don't have factual support for.  So I would think

17    there's more of an ethical problem in simply alleging as a

18    fact an element of the offense without having done any

19    investigation as to whether it's true or not.

20         MR. LEMBERG:  If you assume that -- I think that

21    may be true for somebody who's out of law school and never

22    done a case like this.  This is what I do.  And since this

23    is what I do, I know that these folks are using a system.

24    They just are.

25         THE COURT:  Okay.  So what you're telling me is,

1  what, you're a witness in the case?

2          MR. LEMBERG:  No, I wouldn't be that.

3          THE COURT:  Well, that's the factual basis you

4  have.

5          MR. LEMBERG:  I'm telling you that my Rule 11

6  obligation is fulfilled.

7          THE COURT:  Well, what do you know about this

8  defendant's system that allows you to say, as a fact, that

9  they used an automated system?

10         MR. LEMBERG:  I -- without breaking the

11  mediation obligations, I wouldn't be able to answer that

12  unless there was a waiver.  I doubt there will be.

13         THE COURT:  You're asking me to assume what you

14  have assumed in these pleadings.  You're assuming --

15         MR. LEMBERG:  I'm asking you to draw an

16  inference from what I have pled, that it is possible

17  that --

18         THE COURT:  We need plausible.

19         MR. LEMBERG:  -- plausible, believable that

20  they're using a computer, and there are plenty of cases

21  that do that and --

22         THE COURT:  All right.

23         MR. LEMBERG:  -- and that's what I'm asking.

24  I'm asking you to give us a chance to do discovery.  We

25  may be -- it's not outside the realm of possibility that

1  we're wrong, but I don't think we are in this case.  I

2  think that the only -- I think that it's plausible that a

3  computer was used; it is.  Is it definite?  No.  Are we

4  describing the way we would be describing it at summary

5  judgment, what system was used and what it was doing?  No.

6  Must we at pleading stage?  No.

7          THE COURT:  All right.  Well, I think I've asked

8  my questions.  Either of you have further argument you

9  want to make?

10          MR. SHAW:  Your Honor, we've talked about

11  everything I think we wanted to talk about today.

12          MR. LEMBERG:  If you're inclined to dismiss, I

13  would make an oral motion to amend.

14          THE COURT:  Well, I think what ought to happen

15  is we ought to get these ads.  I'm not sure I want to have

16  open discovery about all of the elements, but let's at

17  least send these ads over.

18          MR. SHAW:  Absolutely, Your Honor.

19          THE COURT:  I do think we should get an amended

20  complaint.  I'm not comfortable with this complaint,

21  frankly.  I think consent is an element of your claim that

22  you need to plead and eventually prove, and you haven't

23  done that.  The plausible inference that I draw from this

24  complaint is that your client consented because he

25  initiated a text that was a coded text that he had to have

1  gotten from some marketing materials.  It would surprise

2  me in this day and age if those marketing materials didn't

3  set forth the required disclosures or have a link to the

4  required disclosures.  And if they did, then I think his

5  text constitutes a signing, maybe not, but it looks that

6  way to me, and so it seems to me that's an initial --

7  that's an initial pleading burden that we can probably

8  figure out very quickly.

9          I have expressed my concern about the inferences

10  that logically reasonably arise from the allegations

11  regarding ATDS, so if you want to improve upon that in

12  your amended complaint, I think that would be a good thing

13  to do.

14          The standing, I haven't thought through the

15  distinction between the two alleged classes, but I don't

16  think that *Spokeo* in general is going to be a problem

17  here.

18          So, anyway, my thought is, in effect, to grant

19  the motion to dismiss without prejudice, to have those

20  marketing materials sent over, to get an amended complaint

21  and to see where we are at that point.

22          MR. LEMBERG:  Judge, there is precedent out

23  there for prefiling discovery.

24          THE COURT:  Well, there's precedent for

25  everything.

1    MR. LEMBERG:  And we are -- nothing in Rule 26

2 prohibits discovery before a motion to dismiss is decided,

3 certainly not in this district.  So I would request the

4 ability to do limited discovery for the purpose of

5 identifying the system the defendant used and supplying

6 you with additional information that would enable you to

7 judge whether we have pled sufficient information under --

8 to state a claim under the TCPA.  That is a motion I'm

9 making right now.  Will you please grant it?

10    THE COURT:  Well, what do you mean by discovery?

11    MR. LEMBERG:  Perhaps a 30(b)(6) deposition and

12 a two, three-item document request.  If a third party is

13 involved, permission to subpoena the third party for a

14 two-hour deposition and ask them for three categories of

15 documents.

16    MR. SHAW:  If I may, Your Honor?  Sort of what

17 we just heard was it may continue on, right, to a 30(b)(6)

18 and maybe a subpoena, so we're talking about two

19 depositions, document request.  That sounds like discovery

20 in this case without an operative pleading.  Your Honor, I

21 think, has already been gracious enough to require us to

22 provide the consent issue which may be determinative on

23 its face.  We would propose, Your Honor, that they file

24 their amended complaint, and we revisit the issues that we

25 talked about here today, and they plead it as they can

1   with the plaintiff's knowledge and information that they

2   have.  It just strikes me now that we're just doing

3   discovery in this case, and we're moving on to summary

4   judgment without yet dealing with an operative pleading if

5   we go down the road that Mr. Lemberg has suggested.

6           MR. LEMBERG:  Well, on the post-stop messages, I

7   think to the extent there is consent pre-stop, I think

8   post-stop messages are fair game, and the concern there is

9   ATDS.  I accept Your Honor's concerns, but they're not

10  insurmountable.

11          THE COURT:  Well, it's a close call on what

12  inferences arise, I mean, you know.

13          MR. LEMBERG:  I'll help you make it.  I'll spend

14  the time, do a little discovery, throw it in the complaint

15  and --

16          THE COURT:  I really don't like the idea of

17  doing discovery to find a claim, I have to say.  All one

18  has to do is receive a text message, and suddenly you've

19  got leverage over a client, over a corporation that is

20  going to pay you off just to not have to do that.

21          MR. LEMBERG:  Look, we had a mediation in this

22  case, Judge.  Somebody has got to do this work.  You know,

23  either the government is policing text messaging or

24  private plaintiffs.  There was just a study put out by one

25  of Justice Scalia's former clerks, who is in the

1  conservative think tank, and his position is class actions

2  are an effective way to police corporate behavior because

3  the government doesn't have to spend any money.  So, you

4  know, this kind of stuff -- these laws exist so that you

5  and I don't spend time treating our text messages the same

6  way we treat our email boxes, which is with complicated

7  spam filters, and even then we waste time pressing delete,

8  delete, delete.  Maybe -- it's a close call on the

9  pleading stage.  Nothing stops us from doing limited

10  discovery.

11        THE COURT:  Well, let's get another complaint.

12  Get the ads over.  We'll get another complaint.  If you've

13  got more to say, say it, and we'll take up whatever issues

14  have to be taken up by way of motion to dismiss or

15  otherwise.

16        I will comment that this doesn't look like a

17  classic class action because of who the plaintiff is,

18  because there was apparent authorization and then almost

19  an immediate withdrawal.  It's -- do you fly fish?  You

20  know, you throw it out there, you pull it out, throw it

21  out there, pull it out, and you hope that somebody snaps

22  at it.  You know, that's the sense I have about what

23  happened here.  I don't know if this is the greatest class

24  representative, frankly.

25        MR. LEMBERG:  I think you are making inferences

1  at this juncture that I'm not sure are warranted.  I

2  certainly --

3          THE COURT:  Let me put it this way.  This is not

4  the worst text message case I've ever seen.  This is not

5  some random text message that came in.  It's a text

6  message that came in after it was authorized.  Whether it

7  met the technical consent requirements or not, it was

8  authorized, and the fact that it came in, that last

9  message came in at or about the time of the confirmation

10  of the stop, looks like a hypertechnical claim, and --

11          MR. LEMBERG:  I live in that world.

12          THE COURT:  -- how many people are out there

13  with hypertechnical claims where this is a good class

14  representative?

15          MR. LEMBERG:  How many?  I'm sure there are

16  thousands.

17          THE COURT:  How many people came in with a text

18  message at or about the time of the unsubscribe

19  confirmation and were annoyed that instead of getting a

20  single unsubscribe, they got an unsubscribe that was

21  accompanied by a response to an earlier text that they had

22  sent?

23          MR. LEMBERG:  Can I persuade you otherwise?

24          THE COURT:  I can be persuaded of anything, but

25  I'm just saying it's --

1          MR. LEMBERG:  I make my living in this world of

2    post-stop calls, and I have for years, ever since I left

3    my prior firm.  It's not your typical class action because

4    this is an unusual fact pattern in the world of fact

5    patterns that judges typically see.

6          THE COURT:  Right.

7          MR. LEMBERG:  Judges typically don't see these

8    cases.

9          THE COURT:  Okay.

10          MR. LEMBERG:  But they exist out there in

11   multitude.

12          THE COURT:  Let me just comment a little bit

13   more because this may be helpful to you two if you're

14   trying to resolve this case.  I have deep concerns about

15   class actions where the only damages are statutory

16   damages.  I've said that in writing before.  Judge Newman

17   has said that in writing before.  What you have is the in

18   terrorem effect of thousands of people who are entitled by

19   statute to either $500 or up to $1,500, and when you put

20   that together, the in terrorem effect, the settlement

21   value of the case becomes such that no corporation,

22   realistically, can ever try that case.  They have to

23   settle it.  And so they're spending who knows how much

24   money because people like Mr. Moskowitz received a text,

25   one text, moments after or maybe even at the same time as

1     his unsubscribe text, and that's not a $500 inconvenience,

2     quite frankly.  I'm just --

3             MR. LEMBERG:  Look, I understand that, and -- I

4     understand that, but I don't write these laws.

5             THE COURT:  Right.

6             MR. LEMBERG:  And I didn't write it, Moskowitz

7     didn't write it, and you, Judge, didn't write it.

8             THE COURT:  I didn't write it.  For sure I

9     didn't write it.

10             MR. LEMBERG:  And if I had to write it, I would

11     do it differently.

12             THE COURT:  But what I have to do is I have to

13     decide whether this is a class action or not.  And so

14     things such as the in terrorem effect of having a

15     certified class of people who have nothing but a statutory

16     claim on a super hypertechnical violation is something

17     that I have to decide under Rule 23.

18             MR. LEMBERG:  Using the requirements of Rule 23,

19     which -- these claims exist, Judge, so that other ends can

20     be accomplished.

21             THE COURT:  Of course they do, and that's the

22     idea.  And so everybody who gets that kind of text can

23     call up Fairway and say, I want my $500 or I'm going to

24     court, and that would be a huge disincentive.

25             MR. LEMBERG:  Yeah, but there's all these -- a

1    few years ago I got interviewed by some publication, and

2    they said, Well, you know, you're the biggest filer of

3    FDCPA cases in the country.  What do you say?  People say

4    that they're going through the roof, unfair to

5    corporations.

6              So as I was sitting there at my computer on

7    Summer Street, I said, Well, let me take a look, and I

8    pulled up how many personal injury cases got filed in the

9    Stamford court that year, and it was like 50,000.  I said

10   so -- and then I got back on the line with the journalist,

11   and I said, Look, are you telling me that 10,000 cases a

12   year in the whole country is too much, when there's 50,000

13   personal injury cases get filed in Stamford every year for

14   neck and back and that kind of thing?  I don't think any

15   of this is out of control or unfair.  People have to

16   follow the rules.

17             THE COURT:  Sure.  The difference is statutory

18   damages versus actual damages.  When you're in a car

19   accident, somebody rear-ends you and you lose time from

20   work, that's different than the inconvenience of deleting

21   a text, one text, that came in moments after you told them

22   not to text you.  That's all I'm saying.  That's all I'm

23   saying.

24             MR. LEMBERG:  I hear you, but I feel the same

25   way about the parking ticket that I got last time I was

1   here two weeks ago.  It was 25 bucks, and I was only -- I

2   was five minutes late to the meter, and it was 25 bucks,

3   and then what am I going to say?  It's unfair.  It's a lot

4   more punitive than the 500 bucks.

5           THE COURT:  I think people are -- it's less

6   punitive than 500 bucks.

7           MR. SHAW:  By 475.

8           MR. LEMBERG:  But I'm just a little guy.  I'm

9   not Fairway.  To me 25 bucks is a lot more than 500 bucks

10  to them.

11          THE COURT:  Well, okay, but you can join -- I

12  think there is a litigation about those new parking

13  meters, so maybe you're a member of a class and don't know

14  it.  All right.  So how quickly can you get the ads over?

15          MR. SHAW:  I think I can do it quicker than

16  this, but two weeks if you could give me, Your Honor, and

17  I'll get it to him as soon as I can.

18          THE COURT:  All right.  And then three weeks

19  after that we'll get a complaint?

20          MR. LEMBERG:  Sure.

21          THE COURT:  All right.  Just to be clear,

22  though, the ruling that I said before is the ruling, so

23  I'm going to grant the motion but without prejudice to

24  refiling an amended complaint, further amended complaint.

25  Okay?

1              MR. SHAW:  Thank you, Your Honor.

2              MR. LEMBERG:  Thanks, Judge.

3              THE COURT:  Thank you all.  We'll stand in

4    recess.

5              (Proceedings adjourned at 2:43 p.m.)

C E R T I F I C A T E

No. 3:16-cv-01831-SRU

Craig Moskowitz v. Fairway Group Holdings Corp


        I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


                    October 17, 2017


                    /S/ Sharon L. Masse
                 Sharon L. Masse, RMR, CRR
                  Official Court Reporter
                  915 Lafayette Boulevard
              Bridgeport, Connecticut  06604
                    Tel: (860)937-4177